**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE, INC. | No. 2:23-mj-268-KFW |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A WARRANT**

I, Mark Mageles, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Law Enforcement Officer with the United States Forest Service (USFS), stationed on the White Mountain National Forest, Saco Ranger District, in Maine and New Hampshire. I have been employed as a law enforcement officer with the USFS for 21 years. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia and investigate federal crimes when the USFS is the victim or is a party of interest. Prior to my employment with the USFS, I was a Law Enforcement Ranger with the National Park Service for 6 years. My current duties include the investigation and enforcement of Forest Service regulations codified in 36 Code of Federal Regulations, Title 18 United States Code, and Title 21 Controlled Substance Act. I have successfully investigated dozens of federal felony property crimes utilizing electronic devices to include game cameras, GPS tracking units for automobiles, as well as forensic evidence collection to include latent fingerprints and blood DNA.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses.

3. I submit this affidavit in support of an application for a search warrant for records of location information that is stored at premises controlled by Google, Inc.

4. Probable cause exists to believe that information stored at Google, Inc. will constitute or lead to evidence of offenses involving a Damage to Government Property, in violation of Title 18, United States Code, Section 1361 (the "Target Offense") as well as the identification of individuals who are engaged in the commission of these offenses.

## JURISDICTION

5. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. Specifically, the District Court of Maine is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## BACKGROUND RELATING TO GOOGLE AND RELEVANT TECHNOLOGY

6. Based on my training and experience, I know that cellular devices, such as mobile telephones, are wireless devices that enable their users to send or receive wire and/or electronic communications using the networks provided by cellular service providers. Using cellular networks, users of many cellular devices can send and receive communications over the Internet.

7. I also know, based on my training and experience, as well as conversations with other law enforcement officers with specialized training, that many devices, including but not limited to cellular devices, have the ability to connect to wireless Internet ("wi-fi") access points if the user enables wi-fi connectivity. These devices can, in such cases, enable their users to send or receive wire and/or electronic communications via the wi-fi network. A tablet such as an iPad is an example of a

device that may not have cellular service but that could connect to the Internet via wi-fi. Wi-fi access points, such as those created through the use of a router and offered in places like homes, hotels, airports, and coffee shops, are identified by a service set identifier ("SSID") that functions as the name of the wi-fi network. In general, devices with wi-fi capability routinely scan their environment to determine what wi-fi access points are within range and will display the names of networks within range under the device's wi-fi settings.

8. Based on my training and experience, I also know that many devices, including many cellular and mobile devices, feature Bluetooth functionality. Bluetooth allows for short-range wireless connections between devices, such as between a device such as a cellular phone or tablet and Bluetooth-enabled headphones. Bluetooth uses radio waves to allow the devices to exchange information. When Bluetooth is enabled, a device routinely scans its environment to identify Bluetooth devices, which emit beacons that can be detected by devices within the Bluetooth device's transmission range, to which it might connect.

9. Based on my training and experience, I also know that many cellular devices, such as mobile telephones, include global positioning system ("GPS") technology. Using this technology, the device can determine its precise geographical coordinates. If permitted by the user, this information is often used by apps installed on a device as part of the apps' operation.

10. Based on my training and experience, I know Google is a company that, among other things, offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Nearly every device using the Android operating

system has an associated Google account, and users are prompted to add a Google account when they first turn on a new Android device.

11. In addition, based on my training and experience, I know that Google offers numerous apps and online-based services, including messaging and calling (e.g., Gmail, Hangouts, Duo, Voice), navigation (Maps), search engine (Google Search), and file creation, storage, and sharing (e.g., Drive, Keep, Photos, and YouTube). Many of these services are accessible only to users who have signed into their Google accounts. An individual can obtain a Google account by registering with Google, and the account identifier typically is in the form of a Gmail address (e.g., example@gmail.com). Other services, such as Maps and YouTube, can be used with limited functionality without the user being signed into a Google account.

12. Based on my training and experience, I also know Google offers an Internet browser known as Chrome that can be used on both computers and mobile devices. A user has the ability to sign-in to a Google account while using Chrome, which allows the user's bookmarks, browsing history, and other settings to be uploaded to Google and then synced across the various devices on which the subscriber may use the Chrome browsing software, although Chrome can also be used without signing into a Google account. Chrome is not limited to mobile devices running the Android operating system and can also be installed and used on Apple devices and Windows computers, among others.

13. Based on my training and experience, as well as conversations with other law enforcement officers with specialized training, I know that, in the context of mobile devices, Google's cloud-based services can be accessed either via the device's Internet browser or via apps offered by Google that have been downloaded onto the

4

device. Google apps exist for, and can be downloaded to, devices that do not run the Android operating system, such as Apple devices.

14. According to open-source materials published by Google, and my training and experience, I know that Google offers account holders a service called "Location History," which authorizes Google, when certain prerequisites are satisfied, to collect and retain a record of the locations where Google calculated a device to be based on information transmitted to Google by the device. That Location History is stored on Google servers, and it is associated with the Google account that is associated with the device. Each accountholder may view their Location History and may delete all or part of it at any time.

15. Based on my training and experience, I know that the location information collected by Google and stored within an account's Location History is derived from sources including GPS data and information about the wi-fi access points and Bluetooth beacons within range of the device. Google uses this information to calculate the device's estimated latitude and longitude, which varies in its accuracy depending on the source of the data. Google records the margin of error for its calculation as to the location of a device as a meter radius, referred to by Google as a "maps display radius," for each latitude and longitude point.

16. Based on open-source materials published by Google and my training and experience, I know that Location History is not turned on by default. A Google accountholder must opt-in to Location History and must enable location reporting with respect to each specific device and application on which they use their Google account in order for that usage to be recorded in Location History. A Google accountholder can also prevent additional Location History records from being created at any time by

turning off the Location History setting for their Google account or by disabling location reporting for a particular device or Google application. When Location History is enabled, however, Google collects and retains location data for each device with Location Services enabled, associates it with the relevant Google account, and then uses this information for various purposes, including to tailor search results based on the user's location, to determine the user's location when Google Maps is used, and to provide location-based advertising. As noted above, the Google accountholder also has the ability to view and, if desired, delete some or all Location History entries at any time by logging into their Google account or by enabling auto-deletion of their Location History records older than a set number of months.

17. Location data, such as the location data in the possession of Google in the form of its users' Location Histories, can assist in a criminal investigation in various ways. As relevant here, I know based on my training, experience and through conversations with other law enforcement officers, that Google has the ability to determine, based on location data collected and retained via the use of Google products as described above, devices that were likely in a particular geographic area during a particular time frame and to determine which Google account(s) those devices are associated with. Among other things, this information can indicate that a Google accountholder was near a given location at a time relevant to the criminal investigation by showing that his/her device reported being there.

18. Based on my training and experience, I know that when individuals register with Google for an account, Google asks subscribers to provide certain personal identifying information. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses,

6

and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

   19. Based on my training and experience as well as conversations with other law enforcement officers with specialized training, I also know that Google typically retains and can provide certain transactional information about the creation and use of each account on its system. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, Google often has records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

## FACTS SUPPORTING PROBABLE CAUSE

### Between 10:57 p.m. on June 18, 2023 and 4:32 a.m. on June 19, 2023, Vandalism to Government Property in a Remote Area of the White Mountain National Forest in Maine

20. The United States Forest Service is currently investigating the vandalism of government property at three sites in a remote area of the White Mountain National Forest in Maine, all of which are in close proximity to one another. As described below, one of the sites was vandalized between 8:58 p.m. on June 18, 2023 and 4:32 a.m. on June 19, 2023, and there is reason to believe that the other two sites were vandalized within the same period of time.

21. At Evans Notch Overlook, the Forest Service had an informational kiosk on display to educate the public about the geology and wildlife in the area. This kiosk was removed from the ground and thrown over an embankment sometime between the hours of 8:58 p.m. on June 18, 2023 and 4:32 a.m. on June 19, 2023.

22. I know that the kiosk was removed during this timeframe because the Forest Service had previously installed a camera at the Overlook, which captured an image every 5 seconds during daylight hours and shutdown overnight. After discovering that the kiosk was thrown over an embankment, I reviewed the photos taken by the trail camera. The photos indicate that the kiosk was in place when the camera shut down at 8:58 p.m. on June 18, 2023, but that the kiosk was missing when the camera turned on at 4:32 a.m. on June 19, 2023. Accordingly, I determined that the kiosk was vandalized while the camera was offline that night.

23. Around the same time, the bathroom facility at the Caribou/West Mud Brook Trailhead was destroyed.¹ This site is approximately 3.4 miles north of Evans Notch Overlook. The building, which was made of wood, had been bolted to a concrete slab. However, the walls had been torn from the trusses and the roof was caved in, indicating that a pick-up truck or another vehicle with a lot of force had attempted to pull the building off the concrete slab. In addition, we found tire tracks at the site, which had a wheelbase and diameter consistent with the tire tracks that would be left by a pick-up truck.

24. Due to the remote location, the Caribou/West Mud Brook Trailhead is not surveilled on a daily basis. However, the bathroom facility was last observed intact sometime between June 14, 2023 and June 16, 2023, and we identified the damage to the bathroom on June 20, 2023 (after we learned of the damage to the kiosk at Evans Notch Overlook). Accordingly, the damage occurred sometime between June 14, 2023 and June 20, 2023.

25. Also around the same time, a road grader owned by the Forest Service was damaged. This road grader was parked on Wild River Road (a/k/a Forest Road 753) just before the New Hampshire border, approximately 3.2 miles northwest of the Caribou/West Mud Brook Trailhead. Specifically, one of the road grader's tires was slashed and the tempered glass was busted on the windshield and windows. Forest Service rangers parked the road grader at this location on June 15, 2023 and identified the damage when they returned on June 20, 2023. Accordingly, the damage to the road grader occurred sometime between June 15, 2023 and June 20, 2023.

---

¹ The bathroom facility was last observed intact sometime between June 14-16, 2023. Due to the remote location of the sites, they are not surveilled on a daily basis.

26.     As noted above, the three vandalized sites are in close proximity to one another. Evans Notch Overlook and the Caribou/West Mud Brook Trailhead are on Route 113 and both are only accessible by car from Route 113. The road grader was parked on Wild River Road (a/k/a Forest Road 753), which is also only accessible from Route 113, as it is a dead-end road originating from Route 113. As pictured below, when traveling northbound on Route 113, one would first pass Evans Notch Overlook, then Caribou/West Mud Brook Trailhead (approximately 3.4 miles later), and then Wild River Road (the location of the road grader was approximately 3.2 miles from the Trailhead).



27.     All three of the vandalized sites are in a very remote area within the White Mountain National Forest that does not include any residences or businesses. There are campgrounds in the vicinity, but each campground is at least 1.5 miles from one of the vandalized sites. Aerial images of each of the sites are included below.



28.     Based on my training and experience, I know that vandalism to Forest Service property in this remote area is very uncommon. As a result, it is likely that the damage to each site was done by the same individual(s) and on the same occasion. This is particularly true given the close proximity of the three sites.

11

29.     I know that the traffic on Route 113 was extremely light overnight on June 18, 2023. The Forest Service had previously placed a license plate camera on the northbound side of Route 113, approximately 1.5 miles south of Evans Notch Overlook. After discovering the vandalism described above, I reviewed the photos taken by the license plate camera. The camera captured only two vehicles traveling northbound on Route 113 between 8:58 p.m. on June 18, 2023 and 4:32 a.m. on June 19, 2023.[2]

30.     The first vehicle drove past the camera at approximately 9:30 p.m. This vehicle was a Jeep Compass bearing a New Hampshire license plate, which is registered to a 25-year-old woman residing in Gorham, New Hampshire.[3] The second vehicle drove past the camera at 10:57 p.m. This vehicle was a Chevrolet Silverado pick-up truck bearing Maine registration 719BHK, which is registered to Robert Myslik, a 22-year-old male from Standish, Maine.

31.     Due to the nature of the damage to the Caribou/West Mud Brook Trailhead bathroom and the tire tracks identified at the scene (both of which indicated the presence of a pick-up truck), the direction that the Chevrolet Silverado was traveling (northbound towards all three vandalized sites), and the lack of other traffic on Route 113 that night (and in general), I suspect that the driver of the pick-up truck may have been involved in the vandalism described above.

32.     Through my investigation, I identified the cell phone number belonging to Robert Myslik, the registered owner of the Chevrolet Silverado.[4] I also learned that the

---

[2] The camera was not set up to capture vehicles traveling southbound on Route 113. However, based on my training and experience, I know that overnight traffic on Route 113 southbound is also typically very light.
[3] The license plate and name of this individual is known to me. Based on my familiarity with the area, as well as my training and experience, I know that Route 113 northbound leads towards Gorham, New Hampshire.
[4] This phone number is known to me.

provider for this phone number is Bell Atlantic (which is affiliated with Verizon Wireless). I sought subscriber records from Verizon Wireless, which indicated that the phone number is subscribed to Edie Milliken of 7 Judith Street in Lewiston, Maine. Through a database search, I learned that Myslik previously resided at this address from approximately January 2019 to October 2021, and that this address is listed on Myslik's driver's license. I do not presently know the relationship between Myslik and Edie Milliken.

33. Based on my training and experience, I know that Route 113 is in a remote location and is poorly lit overnight. Therefore, it is highly likely that any individual driving on this road late at night or early in the morning would be carrying a mobile device with them. Furthermore, it is highly likely that any such individual would be using an application such as Google Maps to ensure that they do not get lost.

### Need for the Requested Information

28. The requested warrant will allow investigators to identify devices that were in the vicinity of Evans Notch Overlook, Caribou/West Mud Brook Trailhead, and Wild River Road (a/k/a Forest Road 753) at the time of the vandalism, which occurred between 10:57 p.m. on June 18, 2023 and 4:32 a.m. on June 19, 2023. Information from Google will aid investigators in identifying devices that were in the area during this time. This evidence will aid law enforcement in its investigation of those suspected to be involved.

29. Based on the foregoing, I submit that there is probable cause to search information that is currently in the possession of Google and that relates to the devices that reported being within the Target Location described in Attachment A during the time period described in Attachment A for evidence of the crime(s) under

investigation. The information to be searched includes (1) identifiers of each device; (2) the location(s) reported by each device to Google and the associated timestamp; and (3) basic subscriber information for the Google account(s) associated with each device.

30. The proposed warrant sets forth a multi-step process whereby the government will obtain the information described above. Specifically, as described in Attachment B.I.:

    a. Using Location History data, Google will identify those devices that it calculated were or could have been (based on the associated margin of error for the estimated latitude/longitude point) within the Target Locations described in Attachment A during the time period described in Attachment A. For each device, Google will provide a unique device ID assigned by Google, and its location coordinates along with the associated timestamp(s), margin(s) of error for the coordinates (*i.e.,* "maps display radius"), and source(s) from which the location data was derived (*e.g.*, GPS, wi-fi, bluetooth), if available. Google will not, in this step, provide the Google account identifiers (*e.g.,* example@gmail.com) associated with the devices or basic subscriber information for those accounts to the government.

    b. The government will identify to Google the devices appearing on the list produced in step 1 for which it seeks the Google account identifier and basic subscriber information. The government may, at its discretion, identify a subset of the devices.

c. Google will then disclose to the government the Google account identifier associated with the devices identified by the government, along with basic subscriber information for those accounts.

31. This process furthers efficiency and privacy by allowing for the possibility that the government, upon reviewing contextual information for all devices identified by Google, may be able to determine that one or more devices associated with a Google account (and the associated basic subscriber information) are likely to be of heightened evidentiary value and warrant further investigation before the records of other accounts in use in the area are disclosed to the government.

## CONCLUSION

32. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c).

33. I further request that the Court direct Google to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

_____
Mark Mageles, Law Enforcement Officer
U.S. Forest Service

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: Sep 26 2023

City and state: Portland, Maine

_____
Judge's signature

Karen Frink Wolf, U.S. Magistrate Judge
Printed name and title